UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Douglas Anderson,

Plaintiff,

v.

Independent School District No. 281,
Robbinsdale Area Schools,
Robbinsdale, Minnesota,

Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 01-560 ADM/AJB

---

Margaret O'Sullivan Kane, Esq., Center for Education Law, Ltd., St. Paul, MN, appeared on behalf of Plaintiff.

James R. Andreen, Esq., Erstad & Riemer, P.A., Minneapolis, MN, appeared for and on behalf of Defendant.

---

## I. INTRODUCTION

On June 6, 2002, the Motion for Summary Judgment [Docket No. 12] of Defendant Independent School District No. 281, Robbinsdale Area Schools, Robbinsdale, Minnesota (the "School"), was argued before the undersigned United States District Judge. Plaintiff Douglas Anderson ("Anderson") alleges disability discrimination under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 794 ("RA"), and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363.03. For the reasons set forth below, the Summary Judgment Motion is denied in part and granted in part.

FILED 10-4-02
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## II. BACKGROUND[1]

Anderson is a 57 year-old man born February 20, 1945. Anderson was employed as a custodian for the School from November 22, 1972, until September 4, 1997. During the relevant time period, Anderson was the head night custodian at the Sonnesyn Elementary School ("Sonnesyn"). Plaintiff, who had been employed for 25 years with the School, was terminated on September 4, 1997, after receiving multiple written and oral reprimands for "insubordination." Andreen Aff. Ex. 10. Specifically, the School asserts that Anderson was terminated for failure to punch out and in when leaving the building for lunch or breaks, and for taking extended lunch breaks. Id.

Anderson has suffered since 1970 from "recurrent unipolar depression," adult attention deficit disorder, and a suspected mixed-type personality disorder, causing, among other things, "tremendous stress leading to insomnia and chest pain." Kane Aff. Ex. 7. Anderson's depression was exacerbated by seasonal aggravation in the winter, known as "seasonal affective disorder." Kane Aff. Ex. 8. Anderson has been receiving medical treatment consisting of counseling and continual medication since the 1980s. Anderson Dep. at 38 (Kane Aff. Ex. 38). Plaintiff's mental condition caused him to have panic attacks, which grew progressively worse over the years. Id. at 39. Because Plaintiff was "extremely uncomfortable" while around crowds of people, he would remove himself from such situations. Id. at 38. Part of Anderson's job as head night custodian was to substitute for the head day custodian when he was sick. Id. at 36. However, Anderson was uncomfortable doing so occasioned by a greater number of persons

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

present at the School during the day, so the School did not require him to do so. Id. Plaintiff performed the other duties of his job satisfactorily and without any reprimands or counselings for 23 years, until his first reprimand in November, 1995. Andreen Aff. Ex. 4.

Over time Anderson's condition grew worse. In the summers, he became unable to handle sitting around a table during lunch because of the increased variety of people present as compared to the school year, when the night crew was more consistently the same personnel. Anderson Dep. at 37-38. In the summers, the grounds crew, painting crews, teachers, and others, would sit around the lunch tables, and while Anderson was able to cope with this social interaction at first, his panic attacks became "worse and worse." Id. at 37-39. Accordingly, during the summer months of 1995, Plaintiff took his accumulated five weeks of annual vacation time, combined with some additional personal/family leave, in order to avoid the work situation for a large portion of the summer. Id. at 34-35. Anderson testified that at all times he was capable of physically doing his job, but that he needed to take some time off in order to recuperate, rather than working year-round. Id. at 36-37. Anderson did not tell his supervisors that he was taking the extended time off in the summer of 1995 in order to address his panic attacks and to change some medications, because he was still trying to conceal his condition. Instead, he told the School he was taking the leave to address some concerns he had with his daughter. Id. at 22-23, 25-28, 32-33; Kane Aff. Ex. 32.

Anderson alleges after this first occurrence of taking combined leave time off during the summer months of 1995, he began to receive "reprimands" and counselings[2] at work. On

---

[2] A "counseling" is not a reprimand, but is a non-traditional disciplinary method used by the School to correct employee actions. Andreen Aff. Attach. 2 at 309-16 (Arbitration Hr'g Tr.).

November 11, 1995, Anderson received his first disciplinary action report from the School for "insubordination" for failing to attend a mandatory "head custodian" meeting. Kane Aff. Ex. 31. Anderson explains that he did not attend the meeting because he had felt uncomfortable after the prior meeting, when Anderson had asked his supervisor Ken Flaig ("Flaig") to come to the School that night to discuss attending the meetings with him, but did not see Flaig for six months afterward. Anderson Dep. at 48. Anderson stated that he was sick on two days during that six month period, and that those were the same two days Flaig visited the school. Id. Because Anderson felt that Flaig was avoiding him, and because he "[f]elt very uncomfortable" attending the meetings, he chose to work rather than attend. Id. at 47-49. Anderson claims that he told Flaig prior to receiving the reprimand that when he would drive to the head custodian meetings he would arrive early and sit in his truck in the parking lot feeling so stressed his chest ached. Id. at 49. Following the November 1995 incident, Anderson did not receive another reprimand for over a year.

On May 27, 1996, Anderson's treating physician, Dr. F.S. Abuzzahab, Sr., M.D., sent a letter to Mike Speight ("Speight"), an associate for labor relations for the School, stating that Anderson's chest pains resulting from his depression and other conditions made Anderson unable to perform the functions of his job year-round, and would medically require a leave from June 10 to August 26, 1996. Kane Aff. Ex. 7. Thus, for the second time, Plaintiff was away from work for medical time off during the summer months. Id.

Upon return from this medical leave, Anderson received a disciplinary action form on September 24, 1996, for "tak[ing] [School] property without permission," identifying the incident as a "theft." Andreen Aff. Ex. 3. The form is not signed by a supervisor or Anderson.

A memorandum dated April 18, 1997, from Jim Dahle ("Dahle"), senior associate for business services for the School, identifies this incident as "[m]oving [an] aquarium without permission," for which Anderson received an oral reprimand from the Principal, Lee Drolet Cook ("Cook"). Kane Aff. Ex. 27. The School alleges Anderson received a similar oral reprimand from Cook on December 10, 1996, for "[r]emoving and rearranging furniture and aquarium in the media center." Id. The aquaria in question belonged to Anderson, who had taken them to the school, and maintained and cleaned them during his non-work time at his own expense. Anderson Dep. at 53. Anderson had taken a larger cracked aquarium that was stored in the custodial room at the school and traded it to a friend for a 20 gallon tank with no cracks that was suitable for fish, which he then placed in a classroom at the school. Id. at 53-54. This occurrence led to the "theft" citation. Anderson had also placed an aquarium in the media center of the school, that he personally maintained. Kane Aff. Ex. 32. Anderson maintained the aquaria on weekends and on his own time because "[i]f [he] had to do them with people around [he] couldn't do it." Kane Aff. Ex. 32.

Anderson received another reprimand for insubordination on December 12, 1996, for an incident that occurred on November 18, 1996. Kane Aff. Ex. 28. The School claims that Anderson had placed usable tile materials in a dumpster, and then did not retrieve them from the dumpster when asked to do so. Id. Exs. 27-28. The School asserts that Anderson received a written reprimand for this occurrence from his supervisor and the head custodian, Phil Torkelson ("Torkelson"). Id. Ex. 27. Anderson argues that safety regulations prohibited him from using a ladder to climb into the dumpster alone to retrieve the tile. Anderson Dep. at 91-92.

Plaintiff asserts that he became "good at hiding" his panic attacks due to "years of

practice," but did confide in Torkelson. Kane Aff. Ex. 32. In an August 30, 1997, letter to the School's Human Resources department, Anderson described his condition, and noted that Torkelson had "tried to help him in many ways," such as allowing Anderson to eat at different times than the rest of the crew, or eat by himself, and by allowing Anderson to take breaks alone instead of with other people. Id. Anderson describes that Torkelson allowed him to work by himself most of the time, and that Torkelson did not put him down, or allow the crew to put him down. Id.

In January, 1997, Anderson showed a "bulging beauties" calendar to Flaig, who asked him to remove it from the building. Anderson Dep. at 93; Kane Aff. Ex. 25. Anderson then put the calendar on a boiler room door. Anderson Dep. at 93. As a result of this incident, Anderson received a three-day suspension on February 4, 1997, for "insubordination." Id. at 94. Anderson admits what he did was wrong and that he deserved the suspension. Id. at 94-95. However, Anderson grieved the suspension because he did not fully understand the grievance process and contested a reference in the suspension letter to three instances of insubordination. Id. at 95-96. Anderson lost his grievance. Id. at 94.

On March 6, 1997, Anderson received a "counseling" for allegedly violating School policy regarding the timing of his half-hour lunch and two fifteen-minute breaks during his 3:30 p.m. to 12:00 midnight work day. Kane Aff. Ex. 24. The comment on the disciplinary action form stated: "You may not work through your lunch or a combination of lunch and breaks and subtract this time from your scheduled quitting time." Id. The School alleges that on May 5 and 6, 1997, Anderson punched out for lunch and left the building for longer than 30 minutes. Id. On May 23, 1997, Anderson again received a counseling for allegedly not punching out and then

back in while taking his half-hour lunch breaks, and for leaving the building during lunch break. Id. Ex. 23.

Plaintiff returned from his summer 1997 leave on Monday, August 25. Anderson Dep. at 125-26. The School alleges that on Wednesday, August 27, 1997, senior associate for Human Resources David Baumann ("Baumann") went to Sonnesyn to offer Anderson an alternate position because the School felt he was uncomfortable with his schedule and job. Andreen Aff. Attach. 2 at 175-76 (Arbitration Hr'g Tr.). Baumann believed this measure was intended to be "helpful," and was not punitive or disciplinary "in any way." Id. at 175. The School alleges that Torkelson had left the building at 11:00 a.m. that day for approximately an hour, leaving Anderson in charge. Id. at 384-386. Anderson does not recall when he left for lunch that day or when he returned. Anderson Dep. at 127. Baumann alleges that he arrived at the school at approximately 12:20 p.m., and that he and Principal Cook discovered that Anderson was not there and had not punched out. Andreen Aff. Attach. 2 at 176. Baumann states that sometime just after 12:30 p.m. Anderson returned and Baumann explained the option of creating a different position for him at the same pay that would not require working year-round, but that would be at a school other than Sonnesyn. Id. at 176-77. Anderson responded "I've been here eighteen years, and I've got these two big aquariums set up and the kids love them, and I would love to finish my time out here." Anderson Dep. at 128. Anderson alleges that Baumann then told him: "Well, they're mad because you're taking personal time off." Id. Anderson asked to have a couple days to talk the new position over with his wife, and then called Baumann the following weekend intending to accept the offer. Id.

In the meantime, the School had referred the matter for investigation to Speight. Andreen

Aff. Attach. 2 at 225-27. Speight spoke with Cook and Flaig, and then Anderson, who allegedly told him that he was in the building on August 27, 1997, from 11:35 a.m. and 12:30 p.m. Anderson Dep. at 139-40. Anderson admits that if he told Speight this, it was not true. Id. Speight alleges that Anderson first told him he was in the building from 11:00 a.m. to 12:30 p.m., and then said he had left at 12:00 noon, and there were other inconsistencies in Anderson's explanation. Andreen Aff. Attach. 2 at 234-36. Speight's notes indicate that Anderson admitted to "taking long lunch hours all week." Id. at 234. Speight claims he pleaded with Anderson to just tell him the truth, stating that it could mean the difference between termination and suspension. Id. at 236. Anderson recalls that he was very "rattled" while being questioned about the incident by Speight, and he does not remember exactly what he told Speight. Anderson Dep. at 140.

On August 30, 1997, Anderson wrote a letter to the School expressing that he would be willing to take the position offered to him at a different school in order to remain employed until retirement at age 55, two years later. Kane Aff. Ex. 32. By this time, the School had decided to terminate Anderson. On September 4, 1997, Speight, on behalf of the School, sent Anderson a letter detailing at length his investigation regarding what time Anderson left for and returned from lunch on August 27, 2002, and noticing Anderson's termination for "continued insubordination." Kane Aff. Ex. 19 at 1-2.

## III. DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). Further, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citation omitted).

**B. Discrimination**

Where a plaintiff relies on circumstantial, as opposed to direct, evidence of intentional discrimination, the Court applies the three-stage burden shifting approach developed by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and later refined by the Court in Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981). See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993); Dammen v. UniMed Med. Ctr., 236 F.3d 978, 980 (8th Cir. 2001). Under this framework, the plaintiff bears the initial burden of presenting a prima facie case of discrimination. Dammen, 236 F.3d at 980. If the prima facie case is established, a legal presumption arises that the employer unlawfully discriminated against

the plaintiff. Id. This rebuttable presumption shifts the burden[3] to the employer to produce evidence that the plaintiff was rejected (or someone else was preferred) for a "legitimate, nondiscriminatory reason." Id. If the employer articulates such a reason, the presumption disappears and the McDonnell Douglas framework becomes irrelevant. The sole remaining issue is whether the employer discriminated. Id. The plaintiff then has an opportunity to prove, by preponderance of the evidence, that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. Proof that a defendant's proffered reason is unpersuasive or contrived does not establish plaintiff's proffered reason of discrimination is correct, however. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-47 (2000). That is, it is not enough to *disbelieve* the employer, but rather the plaintiff's explanation of intentional discrimination must be *believed*. Id. at 147.

The parties agree that the ADA claim, Count One, is the focus of Anderson's case and subsumes the RA and MHRA claims, Counts Two and Three. Pl. Mem. in Opp. at 10. The ADA protects qualified persons with disabilities from discriminatory treatment, and requires employers to offer reasonable accommodation to disabled persons. 42 U.S.C. §§ 12102, 12111 (2002). To obtain relief under the ADA, an aggrieved employee must establish that he has a disability, that he is qualified to perform the essential functions of the job, with or without reasonable accommodation, and that he has suffered adverse employment action because of his disability. Benson v. Northwest Airlines, 62 F.3d 1108, 1112 (8th Cir. 1995). The ADA defines a qualified person with a disability as an individual with a disability who, with or without

---

[3] This framework only shifts the burden of production; the burden of persuasion rests at all times with the plaintiff. Id.

reasonable accommodation, can perform the essential functions of his or her job. 42 U.S.C. § 12111(8). The determination of qualification must be based on the individual's capabilities at the time of the employment decision. Duda v. Board of Educ. of Franklin Park Pub. Sch. Dist. No. 84, 133 F.3d 1054, 1059 (7th Cir. 1998) (citing 29 C.F.R. § 1630.2(m) (1997)). Plaintiff bears the burden of proving that he could perform all the essential functions of his job at the time of his termination. Benson, 62 F.3d at 1112.

Anderson has established a prima facie case of disability discrimination. First, Anderson has a disability. Anderson has a "physical or mental impairment that substantially limits one or more of [his] major life activities," as required by the ADA to be considered "disabled." 42 U.S.C. 12102(2) (2002). Anderson has satisfied the "demanding standard" for qualifying as disabled, by producing evidence of "an impairment that prevents or severely restricts [him] from doing activities that are of central importance to most people's daily lives [where the] impairment's impact [is] permanent or long term." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 122 S.Ct. 681, 691 (2002). Anderson's inability to comfortably interact with groups of people, unipolar depression with seasonal aggravation, adult attention deficit disorder, nicotine dependence, history of alcoholism, mixed type suspected personality disorder and obesity, have been diagnosed by his physician as conditions of "lifetime" duration. Kane Aff. Ex. 7. Anderson has now been coping with his condition for over 30 years, and is seen on a monthly basis for pharmacotherapy and supportive psychotherapy. Id. Evidence of record shows Anderson, while fully capable of performing the functions of his job, is unable to execute them in the presence of groups of people. Nor is Anderson able to work year-round as a result of his conditions. This makes Anderson unable to perform "an entire class or broad range of jobs,"

or more accurately, multiple classes of jobs, that require abundant inter-personal interaction and year-round work. Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1207 (8th Cir. 1997).

Second, Anderson has shown that he was qualified to perform the essential functions of his job, and did so for 25 years, including 2 years during which the School accommodated his disability by allowing him to take combined vacation and personal leave time during summer months when increased interaction with others was a more significant part of his job. Third, Anderson has presented some evidence that his termination may have been motivated by his attempts to seek accommodation for his disability. After 23 years of employment, Anderson received his first reprimand just a few months after returning from his first-ever extended summer leave, and the reprimands and counselings increased as he continued to take extended time off during the summers. Anderson has satisfied his burden of establishing a prima facie case.

In turn, the School has met its burden of producing a non-discriminatory reason for Anderson's termination, namely that Anderson was terminated for insubordination, specifically his failure to punch out and in when leaving the building for lunch or breaks, and for taking extended lunch breaks. Andreen Aff. Ex. 10. The School offers a well-documented paper-trail of its attempts to discipline Anderson. This shifts the burden back to Anderson to show that the School's proffered reason for terminating him was a pretext for disability discrimination.

Anderson has met this burden as well. Disputed material issues of fact remain concerning whether or not Anderson's termination resulted from his attempts to seek accommodations for his disability. While the School asserts that Anderson was fired for failing to punch in and out during lunch, and for taking extended lunch breaks, the record suggests that

such requirements were not strictly enforced on School employees. While numerous time cards for Anderson reflect his attempts to punch out and in during the middle of the day for lunch breaks, the time card records of many other School employees reveal that nearly no other employee even periodically attempted to punch out and in during lunch breaks. See Kane Aff. Ex. 33. Combined with Anderson's allegation that he was told by Baumann that "they're mad because you're taking personal time off," and the School's seeming desire to keep Anderson employed only if he was transferred to a different school, suggests a question of fact regarding the School's true motivation for terminating Anderson. Anderson Dep. at 128. The School's Motion for Summary Judgment on Anderson's ADA, RA and MHRA claims, Counts One, Two and Three, is denied.

**C. Section 1983 and Fourteenth Amendment Claims**

Anderson also brings equal protection claims under 42 U.S.C. § 1983, Count Four, and the Fourteenth Amendment, Count Five, alleging a deprivation of overtime pay under color of state law, and lasting embarrassment, humiliation and anguish. Compl. ¶¶ 42-44, 49-51.

> Several requirements must be met to state a claim for municipal liability pursuant to 42 U.S.C. § 1983. First, the complaint must allege that the plaintiff was deprived of a constitutional right. Second, the plaintiff must plead that the constitutional deprivation was caused by a government official acting in accordance with a municipal policy or custom. In addition, boilerplate assertions of municipal liability, without sufficient factual allegations to support those allegations, do not state a § 1983 claim against a municipality. Finally, a plaintiff must allege a specific pattern or series of incidents that support the general allegations.

Carr v. City of Chicago, 660 F. Supp. 375, 376 (N.D. Ill. 1987) (citing Oklahoma City v. Tuttle, 471 U.S. 808 (1985); Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658 (1978); Rogers v. Lincoln Towing Servs., Inc., 771 F.2d 194, 202 (7th Cir. 1985); Hossman v. Blunk,

784 F.2d 793 (7th Cir. 1986)). Anderson fails to establish a so-called Monell claim.

Anderson presents no argument regarding these claims, and has identified no evidence suggesting an unconstitutional formal policy or informal custom of the School. Moreover, no "affirmative link" has been established between the occurrence of the alleged misconduct and any School District policy or custom. Rizzo v. Goode, 423 U.S. 362, 371 (1976). Accordingly, the School's Motion for Summary Judgment on Anderson's equal protection claims, Counts Four and Five, is granted.

**D. Fair Labor Standards Act Claim**

Anderson alleges a violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, Count Six, claiming entitlement to unpaid overtime wages earned. Compl. ¶¶ 56-57. Anderson concedes that his ADA claim is the focus of this lawsuit, but argues that over the course of his 25 years of employment he recurrently worked overtime hours without compensation, and therefore he is entitled to payment. However, Anderson cannot identify any specific hours he worked that should have been subject to overtime. Anderson Dep. at 170. Accordingly, Anderson cannot sustain a FLSA claim. The School's Motion for Summary Judgment on Anderson's FLSA claim, Count Six, is granted.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The School's Motion for Summary Judgment [Docket No. 12] on Anderson's ADA, RA and MHRA claims, Counts One, Two and Three, is **DENIED**, and
2. The School's Motion for Summary Judgment [Docket No. 12] on Anderson's equal protection and FLSA claims, Counts Four, Five and Six, is **GRANTED.**

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Date: October 4, 2002